UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
HY HADDAD,

                 Plaintiff,           **Docket No.:** 22-cv-1906

     -against-                    **COMPLAINT**

                                   **JURY TRIAL DEMANDED**

VICTOR HALABI,
SAULI HALABI,
B & H CELLULAR WHOLESALE, INC.,

                Defendants.
--------------------------------------------------------X

Plaintiff, HY HADDAD, by and through counsel, respectfully submits this Complaint as follows:

## **INTRODUCTION**

1.    This is an action against Victor Halabi, ("Victor" or "V. Halabi"), and his brother Sauli Halabi ("Sauli" or "S. Halabi") (collectively "the Halabis"), for their fraudulent and corrupt actions undertaken as part of an ongoing scheme to unlawfully defraud Plaintiff and others like him and to enrich themselves at Plaintiff's expense.

2.    Defendants have planned, orchestrated, and executed a brazenly fraudulent scheme with the target objective of obtaining substantial sums of money in the form of financing gained through the offer of fraudulently misrepresented

partnerships, dispersing the acquired funds throughout their network of family members, businesses and associates, and attempting to abuse and distort the rules and practices of their religious community to avoid repaying the debts that they incurred.

3.      Plaintiff has suffered substantial damages as a result of Defendants' illegal actions.  Defendants relied upon word of mouth from their allies and upon repeated reassurances from both of the Halabis to obtain funds under fraudulent pretenses despite V. Halabi in particular having spawned a trail of lawsuits, failed arbitrations, and unresolved debts that shows no sign of abating.  Defendants have turned the religious tenets of the community on their heads by their dishonest actions.

4.      Victor and Sauli Halabi run a business called B & H Cellular Wholesale, Inc. ("B & H Cellular").  Sauli was listed as the owner of the business between 2012 and 2018; Victor has been variously listed as Chairman, President and CEO since the company's incorporation in New York State in 2010. B & H Cellular, a company set up to sell a range of listed products from jewelry through electronics to telecommunications equipment, had or has several associated "companies" – including but not limited to AM Wireless ("AM"), American Wireless Group, Inc. ("American"), B & H Watches, Inc. ("Watches"), BH Photo, Inc. ("Photo"), Hi-Tex Fashion, Inc. ("Hi-Tex"), Twin Cell LLC ("Twin Cell") and V & C

Communications, Inc. ("V & C").  At least one of these businesses, Hi-Tex, is also associated with V. Halabi and S. Halabi's father, Ili Halabi ("I. Halabi").

5.      In November of 2018, a mutual acquaintance introduced Plaintiff Hy Haddad ("Haddad") to Defendant Victor Halabi, suggesting that they go into business together by partnering on business deals.  Plaintiff was familiar with V. Halabi's family, as he already knew Defendant Sauli Halabi.   During their introduction, Haddad's acquaintance assured him that he had "done a few deals" with V. Halabi and his business, B & H Cellular, and that they had gone smoothly. Equally if not more importantly, S. Halabi, whom Haddad had known both socially and as a respected member of their community for several years, assured Haddad that his brother was reliable and honest.

6.      Haddad asked for an explanation of the business "opportunity" and V. Halabi gave him the following description after their introduction:   V. Halabi claimed that he engaged in sales of electronics and similarly valuable small goods, which he described as being pre-negotiated, often pre-paid sales or "deals" which took place either through online retailers or as wholesale transactions via a shipping forwarder located in Dubai.  According to V. Halabi, he would receive an order for specific goods which he would obtain and deliver with a pre-arranged profit margin. V. Halabi represented that once the goods were shipped by B & H Cellular to the forwarder in Dubai, the forwarder would hold the goods until the purchaser paid for

them, then send the payment back to the Halabis' business and release the goods to the buyer.  For example, a deal would be arranged as follows:  $45,000 to purchase the goods to be forwarded, with the purchase price to be returned in one and a half weeks with $5,500 profit.  Because the deals were pre-arranged by the end buyers and the profit margin was part of that negotiation, according to the Halabis, there was no risk.  When Haddad questioned what would happen if an end buyer failed to complete the transaction, V. Halabi reassured him that this was rare but that finding another buyer with no change in pricing was simple because the market in Dubai was so eager for his goods.

7.      V. Halabi offered to split the profit on each deal 50/50 with Haddad in exchange for Haddad partnering with him on specific deals and providing the up-front financing.  The Halabis further represented that the business had a well-established customer base and a long history of successful transactions, and merely needed short-term financial backing due to the sizable amounts of goods being bought and sold.

8.      Persuaded by the claims of people that he knew and trusted, Haddad believed from the beginning that he was providing financial backing for a legitimate business that engaged in online sales and additionally sold goods wholesale through a freight forwarding company located in Dubai.  Defendant S. Halabi's assurances lulled Haddad into a false belief that V. Halabi was being truthful and

straightforward in his business dealings.  Further, the first few transactions appeared
to go smoothly, thus further reassuring Haddad.

9.      Haddad continued to fund what he believed to be a legitimate business
over the next several months, during which period he was in near daily contact with
V. Halabi and the two became friendly.  On multiple occasions, he asked questions
of V. Halabi, or at times of S. Halabi, and tried to gain more information about the
ins and outs of B & H Cellular.  On each occasion he would receive reassurances
that were either partially or wholly untrue.  For example, on December 13, 2018,
Haddad asked V. Halabi questions about his sales and V. Halabi responded that he
only sold to long-term clients and that all of his deals were pre-paid, similar to his
representations at the beginning of the relationship and as the months went on.  In
reality, the Halabis were using Haddad to fund a classic "Ponzi" scheme with a single
investor.  V. Halabi would take money from Haddad, use it to purchase items that
did not relate to pre-paid sales and which were sold by V. Halabi at a loss, and then
used his multiple businesses and bank accounts to make it appear as if the business
was profiting from the sales in order to keep the flow of money from Haddad
coming.

10.     Despite the appearance of money coming back from "deals", only the
Halabi family was profiting from the transactions financially supported by Haddad.
The Halabis maintained the scheme by alternately reassuring Haddad and by

5

ensuring that he was under constant pressure to fund new purchases by rolling over the "profits" and payments from previous purchases into new deals. Each time that Haddad expressed concern, V. Halabi would claim to be deeply insulted and would fabricate an explanation. Meanwhile, S. Halabi continued to provide assurances. On January 9, 2019, for example, S. Halabi told Haddad that he had had a phone call with V. Halabi and I. Halabi to "explain everything" and that V. Halabi would be "out on the street" if he lost Haddad as an investor.

11.     Haddad continued to attempt to protect himself and what he believed to be his partnership stake. On January 18, 2019, he asked for copies of the last two months' bank statements. Haddad repeated this request on January 23, 2019, and at approximately monthly intervals would request either bank statements, invoices, or wire transfer records. Haddad was briefly able to persuade V. Halabi to conduct some business through a bank account to which they both had access so that he could watch the flow of funds; but on or about April 11, 2019, Chase Bank closed the business's account shortly after it was opened. V. Halabi blamed Chase and took the opportunity to continue moving funds without oversight from Haddad. As the months went on, Haddad continued to ask for copies of bank statements, wire transfers, invoices and the like in an effort to understand the stories being told by V. Halabi; V. Halabi repeatedly delayed providing any documentation or account access, always claiming to be very busy or unable to access records or get to a bank.

12.     Shortly after the bank closure, Haddad attempted to take a break from financing the business's deals, saying that he wanted "to meet up this week. Discuss perhaps taking a break for a week or 2 and recapping money. Looking at what's open.  Bank accounts and options. And just make sure everything is on the up and up."  V. Halabi responded that May was a "busy season" and that it would not be a good idea to pause at that point.  Having persuaded Haddad to keep the flow of money coming, V. Halabi reversed course and described May as "slow" during messages on May 14, May 16, and May 17, 2019.

13.     While these exchanges were going on, Haddad again expressed concern to S. Halabi, outright asking him if V. Halabi could be stealing from him.  By this time, Haddad was beginning to discover that V. Halabi's responses were sometimes inconsistent with or outright conflicted with things he had said previously.  On May 14, 2019, S. Halabi responded again that V. Halabi wouldn't steal but, significantly, instructed Haddad to go to a bank other than Chase so that "You open the account. You control the funds."

14.     As Haddad continued to invest and V. Halabi continued his creative movement of funds, it became increasingly difficult to track the flow of finances. Separate "deals" took place every few days so that at any given point in time, multiple deals were supposedly outstanding or in the middle of payment.  To further confuse the situation, V. Halabi claimed that his Dubai forwarder frequently sent

payments in the form of multiple wire transfers.  As a result, Haddad relied upon V. Halabi's representations about what Haddad was owed, what funds had come in and from where, and what "deals" were still outstanding.  This system made it possible for V. Halabi to use Haddad's own funds to finance not only V. Halabi's personal expenses but also the purchase of electronics to be sold at a loss as well as the appearance of a steady flow of profits.

15.     Throughout the following months, Haddad continued to try to get access to the business bank accounts, asking for access on May 16, May 30, June 7, July 16, July 29, 2019, August 6, and August 12, 2019, until he was finally given access to a Citibank account.  V. Halabi continued to use accounts at other banks, however, ensuring that Haddad was still kept in the dark as to the actual flow of funds.

16.     In order to sustain the scheme, V. Halabi sometimes pressured Haddad into larger deals, claiming that they were "now or never" opportunities.  For example, on July 30, 2019, V. Halabi pushed Haddad to enter a transaction for 700 items, for a cost of $455,000, claiming that the order was prepaid and his vendors would only have the stock to fill it that day.

17.     In or about August of 2019, V. Halabi began using Haddad's American Express account to purchase Apple products, claiming that he was getting special low prices and would be reselling them at a profit.  From that point on, V. Halabi

used the line of credit on the American Express card to make purchases on several occasions, sometimes requiring Haddad to contact American Express to confirm the purchase because it was so sizable.

18.     Also in August of 2019, Haddad began trying to arrange a meeting with his accountant and V. Halabi to ensure that his records were in order.  V. Halabi refused or rescheduled multiple meetings, attempting to avoid any investigation of his financial practices, over a period of the next few months.

19.     On multiple occasions V. Halabi would blame delayed or partial payments on his "forwarder" purportedly in Dubai and thus with hours and holidays that made them difficult to reach.  For example, on August 27, 2019. V. Halabi claimed that Twin Cell was both a forwarder and a customer with an office in Dubai and in the United States.  V. Halabi went on to claim that wires went through Twin Cell to avoid currency exchange charges between Dubai and the United States.  In reality, of course, Twin Cell was a New York State LLC formed by the Halabis.

20.     V. Halabi went to extreme lengths to preserve the illusion of a Dubai connection that was to blame for irregularities in wire transfers, even going so far as to present Haddad with a forged email, dated December 16, 2019, and purporting to be from Captains Freight Services located in Dubai.  This email was entirely fabricated and there was no business relationship with any such entity.

21.     By September of 2019, however, the Halabis' scheme was beginning to unravel as it became harder and harder to fund V. Halabi's personal expenses and losing financial purchases while still presenting an appearance of a profitable venture to Haddad.  On October 23, 2019, Haddad repeated that he wanted to stop any further interactions until the American Express debt had been dealt with and the financial situation clarified.  Haddad was insistent that he wanted to have an in-person conversation before approving any more spending; V. Halabi continued to put him off but did text him a message claiming that at that point, the amount owed to Haddad for his American Express bill was $250,826.

22.     In addition to the periodic summary texts sent by V. Halabi, Haddad relied on a spreadsheet maintained by V. Halabi as the method to track funds.  The spreadsheet, however, was frequently not updated and was based on false information and numbers created by V. Halabi, who controlled all of the funds flowing into and out of the business.  Rather than being an accurate method of tracking outstanding "deals" it was another tool used to keep Haddad in the dark as to the true nature of the business.

23.     Throughout the month of October and into November, Haddad was increasingly reluctant to engage in further deals until his accountant had had a chance to review everything and, more importantly, until enough of his money had been returned so that he was able to pay taxes without being unable to pay his family's

living expenses.  V. Halabi expressed incredulity at the idea that Haddad wanted to ensure sufficient funds for taxes and resisted Haddad's efforts to stop paying out additional funds.

24.     On November 14, 2019, Haddad asked V. Halabi who BH Photo was, and V. Halabi claimed that it was a vendor who supplied Apple products and electronics to B & H Cellular.  Like Twin Cell, BH Photo was in actuality another business founded by the Halabis and used to funnel funds to perpetuate the scheme. On that same date, Haddad repeated that he would need to stop funding purchases within the next 1-2 weeks; V. Halabi reacted by saying that it was a "bad time to stop" because Christmas season was the busiest time of year.

25.     On November 19, 2019, Haddad repeated that he had to stop until he had sufficient funds available to pay taxes and until his accountant and the Halabis' accountant had ensured the records were in order.  V. Halabi began to panic, texting repeatedly that he felt Haddad was just testing him, no one paid that much in taxes, and that with the busy season they had to continue making purchases to fill his orders.

26.     By late November, V. Halabi was pressuring Haddad on an almost daily basis to do more transactions because it was the "busy period."  When Haddad reminded him multiple times that money he had promised wasn't coming in, V. Halabi denied it and claimed that Haddad's failure to understand the business was

11

the issue.  On December 1, 2019, he succeeded in pressuring Haddad into allowing an additional American Express purchase, then purchased $364,000 worth of iPhones without first confirming that Haddad would authorize that high a purchase amount.

27.     On December 5, 2019, V. Halabi attempted to broaden the scheme by asking Haddad to join a real estate business venture with S. Halabi.  S. Halabi made a similar overture.  Haddad refused both.

28.     On December 11, 2019, Haddad realized that V. Halabi was prepaying for products rather than paying on receipt, as he had previously claimed.  When he confronted V. Halabi with this discovery, V. Halabi first continued to claim that he only paid for products on delivery, then said that Citibank sent the wire to the vendor too fast.

29.     On that same date, December 11, 2019, V. Halabi sent Haddad some accounting paperwork, including a Profit and Loss Statement, a Balance Sheet, a summary of accounts, and an abbreviated list of wire transactions.  V. Halabi claimed that these were the records to be used by B & H Watches, which V. Halabi had moved to the forefront of their transactions earlier in the year, for tax filing purposes.  Haddad and his accountant both became even more concerned at this point, as the numbers on the paperwork sent by V. Halabi were entirely fabricated.

30.     By December 17, 2019, V. Halabi was texting repeated complaints that due to Haddad's reluctance he "lost so many deals" and was "loosing [sic] every day."  Haddad reminded him that there were many "deals" that had not resulted in any payment for several weeks and V. Halabi responded with references to money that had come in late in a further effort to convince Haddad to continue giving him cash.  On that same date, S. Halabi was assuring Haddad that he had spoken to his brother and that he would speak to Haddad about it later.

31.     On December 26, 2019, V. Halabi purchased another $750,000 worth of iPhones using the American Express card, without checking with Haddad first. Haddad reminded him yet again that there were now millions of dollars in outstanding "deals" that remained unpaid – V. Halabi's only response was "but this is different this is not the same."

32.     At the end of December, the scheme crashed to a halt.  On the morning of December 29, 2019, Haddad texted V. Halabi, asking for a sit-down with him and S. Halabi.  V. Halabi responded that he would call later that morning.  V. Halabi did call later in the day and finally agreed to meet in person.  Haddad met with V. Halabi in his car and was stunned when V. Halabi, crying, told him that everything was a lie and confessed to the entire scheme – that all of the money was gone, that all of the deals were fake, that there was no Dubai forwarder and that he had been using Haddad's money to fund everything the entire time.  Haddad was in shock, unable

13

at first to understand the magnitude of either the deception or the amount of money that he and his family had lost.

33.    Later that day, V. Halabi texted an apology to Haddad claiming that he wanted to repay all of the money that he had taken from him.  Haddad responded by asking V. Halabi to meet with his brother S. Halabi and to explain where all of the money went.  S. Halabi told Haddad that they would meet the following afternoon.

34.    Following the horrifying communications from V. Halabi, on December 30, 2019, Haddad met with V. Halabi, S. Halabi, and the mutual friend who had introduced Haddad to V. Halabi.  During that meeting, V. Halabi conceded that his entire business was a scam in which he was using Haddad's own money as the means of repaying Haddad, as well as paying his own debts.  V. Halabi further admitted that he had been selling goods at a loss throughout the entire period, that he had used $700,000 to pay off debts that he owed before meeting Haddad, approximately $300,000 in expenses, and more funds to buy inventory such as iPhones and Ring alarms and the like, to pay his mortgage, and to pay for vacations. V. Halabi further admitted that he didn't really track what was owed to him but instead used estimated numbers by looking at his online sales over the last 90 days. In his most recent transaction, the phones purchased with the American Express card, V. Halabi had sold the phones at a loss of more than $200,000.

35.    Over the history of their interactions, Haddad had invested approximately $4,000,000 in what he had believed to be risk-free profit-making transactions.  V. Halabi admitted that he lost money on every single "wholesale" deal and that the online sales were "real" but his profit was much lower than the amount that he had represented.  He went on to state during the December 30, 2019, meeting that he was planning to continue taking money to maintain the scheme and that he had borrowed money from another friend of S. Halabi's to continue the racket without Haddad realizing what was happening.

36.    Following the December 30, 2019, meeting and V. Halabi's admissions, $624,573 was returned to Haddad through a combination of inventory returns and wire transfers from the Halabis over a two-week period.  Significantly, the $750,000 in iPhones that V. Halabi had purchased just three days before admitting the depth of the deceptive scheme could not be recovered because they had been shipped to a customer in Florida with the buyer paying the shipping charges, thus preventing Haddad from recovering the shipment.  As a result, he was left with an oversized debt to American Express that he could not repay.

37.    The amount recovered from the Halabis left an outstanding balance owed to Haddad of $2,901,223.07.  Moreover, Haddad's credit with American Express had been destroyed as a result of the December 26, 2019, purchase.

38.     Haddad met with V. Halabi and S. Halabi again on January 12, 2020, and again discussed the background of the scheme and the "business."  V. Halabi again conceded that the entire interaction had been a scam.  S. Halabi argued that the amount due to Haddad should be reduced by the losses V. Halabi had taken on the majority of his sales.

39.     Over the next several months, Haddad made repeated efforts to recover his funds from the Halabis without success.  V. Halabi did not contest the validity of the debt but repeated that he did not have the ability to repay it; S. Halabi agreed that the money had been stolen but attempted on various occasions to minimize the amount taken or to make other misrepresentations, such as claiming on February 19, 2020, that the majority of the liens on V. Halabi's house had been paid off when they had not.

## JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

41.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(1) or, alternatively, 28 U.S.C. § 1391(b )(3).

## THE PARTIES

42.     Plaintiff Hy Haddad is a resident of Kings County, New York.

43.     Defendant Victor Halabi is a resident of Kings County, New York.

16

44.     Defendant Sauli Halabi is a resident of Kings County, New York.

45.     Defendant B & H Cellular Wholesale, Inc., is a New York State corporation with a primary business address in Kings County, New York.

## FACTUAL BACKGROUND

### The Fraudulent Statements and Early Interactions

46.     In November of 2018, a mutual acquaintance introduced Plaintiff Hy Haddad to Defendant Victor Halabi, suggesting that they go into business together by partnering on business deals.  Plaintiff was familiar with V. Halabi's family, as he already knew Defendant Sauli Halabi.   During their introduction, Haddad's acquaintance assured him that he had "done a few deals" with V. Halabi and his business, B & H Cellular, and that they had gone smoothly.  Equally if not more importantly, S. Halabi, whom Haddad had known both socially and as a respected member of their community for several years, assured Haddad that his brother was reliable and honest.

47.     Haddad asked for an explanation of the business "opportunity" and V. Halabi gave him the following description after their introduction:   V. Halabi claimed that he engaged in sales of electronics and similarly valuable small goods, which he described as being pre-negotiated, often pre-paid sales or "deals" which took place either through online retailers or as wholesale transactions via a shipping

forwarder located in Dubai.  According to V. Halabi, he would receive an order for specific goods which he would obtain and deliver with a pre-arranged profit margin. V. Halabi represented that once the goods were shipped by B & H Cellular to the forwarder in Dubai, the forwarder would hold the goods until the purchaser paid for them, then send the payment back to the Halabis' business and release the goods to the buyer.  For example, a deal would be arranged as follows:  $45,000 to purchase the goods to be forwarded, with the purchase price to be returned in one and a half weeks with $5,500 profit.  Because the deals were pre-arranged by the end buyers and the profit margin was part of that negotiation, according to the Halabis, there was no risk.  When Haddad questioned what would happen if an end buyer failed to complete the transaction, V. Halabi reassured him that this was rare but that finding another buyer with no change in pricing was simple because the market in Dubai was so eager for his goods.

48.   V. Halabi offered to split the profit on each deal 50/50 with Haddad in exchange for Haddad partnering with him on specific deals and providing the up-front financing.  The Halabis further represented that the business had a well-established customer base and a long history of successful transactions, and merely needed short-term financial backing due to the sizable amounts of goods being bought and sold.

49.   Based on these representations and the fact that Haddad knew and trusted S. Halabi, Haddad believed that he was providing financial backing for a legitimate business – B & H Cellular – that engaged in sales of electronics such as cellular phones, iPads, Ring cameras, smart watches and the like.  Haddad accepted V. Halabi's description of the business as a mix of online sales and wholesale transactions conducted through a freight forwarding company located in Dubai, each category of which was organized into individual deals.   Although initially hesitant, Haddad allowed S. Halabi's assurances and the fact that the first few "deal" transactions seemed to go smoothly into to lull him into a false sense of security.

50.   Haddad continued to fund what he believed to be a legitimate business over the next several months.  V. Halabi ensured that the flow of funds was difficult to track, using different accounts and businesses to move money around and keeping the number of "deals" constant so that Haddad was pouring money into the business every few days.  On multiple occasions, Haddad asked questions of V. Halabi, or at times of S. Halabi, and tried to gain more information about the ins and outs of B & H Cellular.   On each occasion he would receive reassurances that were either partially or wholly untrue.  For example, on December 13, 2018, Haddad asked V. Halabi questions about his sales and V. Halabi responded that he only sold to long-term clients and that all of his deals were pre-paid.  In reality, V. Halabi was using Haddad to fund a classic "Ponzi" scheme with a single investor.  V. Halabi would

take money from Haddad, use it to purchase items that did not relate to pre-paid sales and were sold by V. Halabi at a loss or to pay his personal expenses, and then used his multiple businesses and bank accounts to make it appear as if the business was profiting from the sales. He would then "pay" Haddad back with money previously invested by Haddad himself. On many occasions, V. Halabi would not return any of the money to Haddad, instead claiming that he was "rolling it over" into the next partially or wholly fictitious deal.

51.     In reality, only the Halabi family was profiting from the transactions financially supported by Haddad. The Halabis maintained the scheme by alternately reassuring Haddad and by ensuring that he was under constant pressure to fund new purchases by rolling over the "profits" and payments from previous purchases but needing to have those "profits" supplemented so that there was enough money to fund the new purchases. Each time that Haddad expressed concern, V. Halabi would claim to be deeply insulted and would fabricate an explanation. Meanwhile, S. Halabi continued to provide assurances. On January 9, 2019, S. Halabi told Haddad that he had a phone call with V. Halabi and I. Halabi to "explain everything" and that V. Halabi would be "out on the street" if he lost Haddad as an investor.

52.     Haddad continued to attempt to protect himself and his investments. On January 18, 2019, he asked for copies of the last two months' bank statements. Haddad repeated this request on January 23, 2019, and at approximately monthly

intervals would request either bank statements, invoices, or wire transfer records. Haddad was only briefly able to persuade V. Halabi to conduct some business through a bank account to which they both had access so that he could watch the flow of funds; but only some of the transactions passed through this account, which was located at Chase Bank.

53.   On or about April 11, 2019, Chase Bank closed the business's account. V. Halabi blamed Chase for having closed the account in error and took the opportunity to continue moving funds without any oversight from Haddad.  As the months went on, Haddad continued to ask for copies of bank statements, wire transfers, invoices and the like in an effort to understand the stories being told by V. Halabi; V. Halabi repeatedly delayed providing any documentation or account access, always claiming to be very busy or unable to access records or get to a bank to make Haddad a co-signer.

**Mid-Year Transactions and Misrepresentations**

54.   Shortly after the Chase Bank account closure, Haddad attempted to take a break from financing the business's deals, saying that he wanted "to meet up this week. Discuss perhaps taking a break for a week or 2 and recapping money. Looking at what's open.  Bank accounts and options. And just make sure everything is on the up and up."  V. Halabi responded that May was a "busy season" and that it would not be a good idea to pause at that point.  Having persuaded Haddad to keep the flow

of money coming, V. Halabi reversed course and described May as "slow" during messages on May 14, May 16, and May 17, 2019.  Throughout this time period Haddad continued to try to arrange an in person meeting so that he could get a better understanding of how the business operated and V. Halabi continued to make excuses.

55.    While these exchanges were going on, Haddad again expressed concern to S. Halabi, outright asking him if V. Halabi could be stealing from him.  On May 14, 2019, S. Halabi responded that V. Halabi wouldn't steal but, significantly, instructed Haddad to go to a bank other than Chase so that "You open the account. You control the funds."   Despite assuring Haddad that he was in no danger of being victimized by V. Halabi, S. Halabi told Haddad to watch the money.  Haddad continued to try to do so while V. Halabi dodged providing actual records or account access whenever possible and continued to make false representations.

56.    As Haddad continued to invest in new "deals" and V. Halabi continued his creative movement of funds, it became increasingly difficult to track the flow of finances, particularly with limited account access.  As a result, Haddad relied upon V. Halabi's representations about what Haddad was owed, what funds had come in and from where, and what "deals" were still outstanding.  V. Halabi complicated the process further by claiming that his Dubai-based forwarding company routinely sent payments for single deals in multiple wire transfers.  This system made it possible

for V. Halabi to use Haddad's own funds to finance not only V. Halabi's personal expenses such as his mortgage payments and children's school tuition, but also the purchase of electronics destined to be sold at a loss or at a much lower profit than described to Haddad. The constant flow of funds and Byzantine bookkeeping allowed V. Halabi to create the completely false appearance of a steady flow of profits.

57. Throughout the following months, Haddad continued to try to get access to the business bank accounts, asking for access on May 16, May 30, June 7, July 16, July 29, 2019, August 6, and August 12, 2019, until he was finally given access to a Citibank account. V. Halabi continued to use accounts at other banks, however, ensuring that Haddad was still kept in the dark as to the actual flow of funds.

58. In order to sustain the scheme, V. Halabi sometimes pressured Haddad into larger, more expensive deals, claiming that they were "now or never" opportunities. For example, on July 30, 2019, V. Halabi pushed Haddad to enter a transaction for 700 items, at a cost of $455,000, claiming that the order was prepaid and his vendors would only have the stock to fill it that day so that they had to move quickly. V. Halabi would periodically push for a large deal such as this one to be financed in order to increase the apparent funds flow.

59.   In or about August of 2019, V. Halabi began using Haddad's American Express account to purchase Apple products, claiming that he was getting special low prices and would be reselling them at a profit.  From that point on, V. Halabi used the line of credit on the American Express card to make purchases of hundreds of thousands of dollars' worth of Apple products on several occasions, sometimes requiring Haddad to contact American Express to confirm the purchase because it was so sizable.

60.   Also in August of 2019, Haddad began trying to arrange a meeting with his accountant and V. Halabi to ensure that his records were in order.  Haddad also tried to convince V. Halabi that Halabi's accountant should be involved as well, to ensure that everyone was on the same page and understood the structure of their partnership.  V. Halabi refused or rescheduled multiple meetings, attempting to avoid any investigation of his financial practices.  Whenever he was backed into a meeting, he made it brief and ensured that any follow-up activity was delayed by weeks or months.

### The Dubai Forwarder

61.   On multiple occasions V. Halabi would blame delayed or partial payments on his "forwarder", purportedly located in Dubai and thus with hours and holidays that made them difficult to reach.  V. Halabi would repeatedly claim that Dubai was closed for religious reasons and that no banking or business activity could

24

take place.  The Dubai connection was used by V. Halabi both to explain delays and as a way of concealing his ownership role in some of the businesses used for wire transfers to further complicate the financial trail.  For example, on August 27, 2019, V. Halabi claimed that Twin Cell was both a forwarder and a customer with an office in Dubai and in the United States.  V. Halabi went on to claim that wires went through Twin Cell to avoid currency exchange rate charges between Dubai and the United States.  In reality, of course, Twin Cell was a New York State LLC formed by the Halabis that had no connection to Dubai.

62.   V. Halabi went to extreme lengths to preserve the illusion of a Dubai connection that he could blame for irregularities in wire transfers, even going so far as to present Haddad with a forged email, dated December 16, 2019, and purporting to be from Captains Freight Services located in Dubai.  This email was entirely fabricated, as Haddad later learned.

## The Scheme Unravels

63.   By September of 2019, however, the Halabis' scheme began to unravel as it became harder and harder to fund V. Halabi's personal expenses and losing financial purchases while still presenting an appearance of a profitable venture to Haddad.  On October 23, 2019, Haddad repeated that he wanted to stop any further interactions until the American Express debt had been dealt with and the financial situation clarified.  Haddad was insistent that he wanted to have a conversation

before approving any more spending; V. Halabi continued to put him off but did text him a message claiming that at that point, the amount owed to Haddad's American Express account was $250,826.  This number, although seemingly sizable, was based on the numbers fabricated by V. Halabi throughout the operation of the scheme, rather than on the money actually supplied by Haddad, which was significantly higher.

64.   In addition to periodic summary texts sent by V. Halabi, Haddad relied on a spreadsheet maintained by V. Halabi as the primary method to track funds.  The spreadsheet, however, was frequently not updated and was based on false information and numbers created by V. Halabi, who controlled all of the funds flowing into and out of the business.  Thus, even when Haddad believed that the spreadsheet was up to date, it was inaccurate and simply provided an additional false sense of security.  Rather than being an effective tool to track financial interactions, it was a tool designed and used to keep Haddad in the dark as to the true state the business.

65.   Throughout the month of October and into November, Haddad was increasingly reluctant to engage in further deals until his accountant had had a chance to review everything and, more importantly, until enough of his money had been returned so that he was able to pay taxes without being unable to pay his family's living expenses.  V. Halabi expressed incredulity at the idea that Haddad wanted to

ensure sufficient funds for taxes, saying that no one paid taxes on such large sums of money. V. Halabi resisted Haddad's efforts to stop, as Haddad's funds were essential to keep the scheme rolling.

66. On November 14, 2019, Haddad asked V. Halabi who BH Photo was, and V. Halabi claimed that it was a vendor who supplied Apple products and electronics to B & H Cellular. Like Twin Cell, BH Photo was in actuality another business founded by the Halabis and used to funnel funds to perpetuate the scheme. On that same date, Haddad repeated that he would need to stop funding purchases within the next 1-2 weeks; V. Halabi reacted by saying that it was a "bad time to stop" because Christmas season was the busiest time of year. V. Halabi had frequently used the claim that whatever time of year was upcoming was one of the busiest periods and that it was essential to be making sales during that period as a way of convincing Haddad that his concerns would have to be put aside for another time. On this occasion, however, with the end of the year coming up, Haddad was much less willing to be convinced.

67. On November 19, 2019, Haddad repeated that he had to stop until he had sufficient funds available to pay taxes and until his accountant and the Halabis' accountant had ensured the records were in order. V. Halabi began to panic, texting repeatedly that he felt Haddad was just testing him, no one paid that much in taxes,

and that with the busy season they had to continue making purchases to fill his orders.

68.   By late November, V. Halabi was pressuring Haddad on an almost daily basis to do more transactions because it was the "busy period."  When Haddad reminded him multiple times that money he had promised wasn't coming in, V. Halabi denied it and claimed that Haddad's failure to understand the way the business worked was the real issue.  On December 1, 2019, he succeeded in pressuring Haddad into authorizing an additional large American Express purchase. Despite Haddad's expressed concern about ensuring the purchase was not too large, V. Halabi purchased an additional $364,000 worth of iPhones.

69.   On December 5, 2019, V. Halabi attempted to broaden and perpetuate the scheme by asking Haddad to join a real estate business venture with S. Halabi. S. Halabi had also approached Haddad about investing in real estate with him. Haddad wisely refused to entangle himself further and declined.

70.   On December 11, 2019, Haddad realized that V. Halabi was prepaying for products rather than paying on receipt, as he had previously claimed.  When he confronted V. Halabi with this discovery, V. Halabi first continued to claim that he only paid on delivery, then said that Citibank sent the wire too fast as a feeble excuse for why he was paying for products he had not yet received.

71.   On that same date, December 11, 2019, V. Halabi sent Haddad some accounting paperwork, including a Profit and Loss Statement, a Balance Sheet, a summary of accounts, and an abbreviated list of wire transactions. V. Halabi claimed that these were the records to be used by B & H Watches, which V. Halabi had moved to the forefront of their transactions earlier in the year, for tax filing purposes. Haddad and his accountant both became even more concerned at this point, as the numbers on the paperwork sent by V. Halabi were entirely fabricated.

72.   By December 17, 2019, V. Halabi was texting repeated complaints that due to Haddad's reluctance he "lost so many deals" and was "loosing [sic] every day."  Haddad reminded him that there were many "deals" that had not resulted in any payment for weeks, despite what was supposed to be a short turn-around time. V. Halabi responded with references to money that had come in late in a further effort to convince Haddad to continue giving him cash.  On that same date, S. Halabi was assuring Haddad, who had again approached him with questions, that he had spoken to his brother and that he would speak to Haddad about it "later."

73.   On December 26, 2019, V. Halabi purchased another $750,000 worth of iPhones using the American Express card, without checking with Haddad first. Haddad reminded him yet again that there were now millions of dollars in outstanding "deals" that remained unpaid – V. Halabi's only response was "but this is different this is not the same."

74.   At the end of December the scheme crashed to a halt without Haddad's innocent funding.  On the morning of December 29, 2019, Haddad texted V. Halabi, asking for a sit-down with him and S. Halabi. V. Halabi responded that he would call later that morning.  V. Halabi did call and finally agreed to meet in person. Haddad met with V. Halabi in his car and was stunned when V. Halabi, crying, told him that everything was a lie and confessed to the entire scheme – that all of the money was gone, that all of the deals were fake, that there was no Dubai forwarder and that he had been using Haddad's money to fund everything the entire time. Haddad was in shock, unable at first to understand the magnitude of either the deception or the amount of money that he and his family had lost as a result of the Halabi's deceit.

75.   Later that day, V. Halabi texted an apology to Haddad claiming that he wanted to repay all of the money that he had taken from him. Haddad responded by asking V. Halabi to meet with his brother S. Halabi and to explain where all of the money went. S. Halabi told Haddad that they would meet the following afternoon.

76.   Following the shocking and disturbing revelations from V. Halabi, on December 30, 2019, Haddad met with V. Halabi, S. Halabi, and the mutual friend who had introduced Haddad to V. Halabi.  During that meeting, V. Halabi conceded that his entire business was a scam where he was using Haddad's own money as the means of repaying Haddad.  V. Halabi further admitted that he had been selling at a

loss throughout the entire period, that he had used $700,000 of Haddad's money to pay off debts that he owed before meeting Haddad, approximately another $300,000 in expenses, and that he had used more of Haddad's funds to buy inventory such as iPhones and Ring alarms and the like, to pay his mortgage, to pay for vacations and to pay for tuition for his children.  V. Halabi further admitted that he didn't really track what was owed to him by actual purchasers but instead estimated by looking at his online sales over the last 90 days.  In his most recent transaction, V. Halabi had sold the more than $700,000 in iPhones purchased on the American Express card at a loss of more than $200,000.

77.    Over the history of their interactions, Haddad had invested approximately $4,000,000 in what he had believed to be risk-free profit-making transactions.  V. Halabi admitted that he lost money on every single "wholesale" deal and that on the online sales his profit was much lower than the amount that he had represented.  As an example, V. Halabi said that if he had claimed that he was making an 8% profit on an online transaction the real figure was closer to 2 or 3%.  He went on to state during the December 30, 2019, meeting that he was planning to continue taking money to maintain the scheme and that he had borrowed money from another friend of S. Halabi's to continue the scheme and to prevent Haddad from realizing what was going on.

78.    Following the December 30, 2019, meeting and V. Halabi's admissions, $624,573 was returned to Haddad through a combination of inventory returns – that Haddad himself had to oversee – and wire transfers from the Halabis over a two-week period.  Significantly, the $750,000 in iPhones that V. Halabi had purchased just three days before admitting the depth of the deceptive scheme could not be recovered because they had been shipped to a customer in Florida with the buyer paying the shipping charges, thus preventing Haddad from recovering the shipment. As a result, he was left with an oversized debt to American Express that he could not pay.

79.    The amount recovered from the Halabis left an outstanding balance owed to Haddad of $2,901,223.07. Moreover, Haddad's credit with American Express had been destroyed as a result of the December 26, 2019, purchase.

80.    Haddad met with V. Halabi and S. Halabi again on January 12, 2020. During that meeting, S. Halabi tried to claim that Haddad should be sharing in any "business" losses caused by V. Halabi's sales at a loss.  V. Halabi admitted that he never once told Haddad that he was selling at a loss.   Instead, V. Halabi had continued to lie because he was intending to continue taking money.

81.    Over the next several months, Haddad made repeated efforts to recover his funds from the Halabis without success.  V. Halabi did not contest the validity of the debt but repeated that he did not have the ability to repay it; S. Halabi agreed that

the money had been stolen but attempted on various occasions to minimize the amount taken or to make other misrepresentations, such as claiming on February 19, 2020, that the majority of the liens on V. Halabi's house had been paid off when they had not.

## FIRST COUNT
### (Racketeering)

82.   All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

83.   From at least November of 2018 up through and including December 29, 2019, in the Eastern District of New York and elsewhere, Defendants and others known and unknown, being persons employed by and associated with the racketeering enterprise described in paragraphs 4 through 7 above, namely, B & H Cellular, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully intentionally, and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), that is, through the commission of the following racketeering acts:

### The Pattern of Racketeering

84.   The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1962(a) and (c), consisted of the following acts:

**Racketeering Act One – Wire Fraud**

85.   VICTOR HALABI and SAULI HALABI committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act One:

a. In or about 2018, in the Eastern District of New York and elsewhere, VICTOR HALABI and others known and unknown, including any and all members of the entity B & H CELLULAR WHOLESALE INC. unlawfully, willfully, and knowingly conspired to commit wire fraud, in violation of 18 U.S.C. §1343.   The defendants having devised or intending to devise a scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.   Specifically, Defendant VICTOR HALABI utilized electronic mail and bank wire transfers to fraudulently induce Plaintiff to engage in deals on November 15, 2018, November 21, 2018, and multiple other occasions.  The funds from these deals were used to pay off Defendants' existing debts and to aid in presenting the appearance of a

profitable business, rather than to engage in the activities described by Defendants in email and text message communications.

b. In or about 2019, in the Eastern District of New York and elsewhere, VICTOR HALABI and others known and unknown, including any and all members of the entity B & H CELLULAR WHOLESALE INC. unlawfully, willfully, and knowingly conspired to commit wire fraud, in violation of 18 U.S.C. §1343.   The defendants having devised or intending to devise a scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.   Specifically, Defendant VICTOR HALABI utilized electronic mail and bank wire transfers to fraudulently induce Plaintiff to engage in deals on April 8, 2019, and multiple other occasions.   The funds from these deals were used to pay off Defendants' existing debts and to aid in presenting the appearance of a profitable business, rather than to engage in the activities described by Defendants in email and text message communications.   Defendant SAULI HALABI reassured Plaintiff on

multiple occasions that VICTOR HALABI was dealing with him honestly and would not steal funds.

86.    The target objective of the wire fraud was to deprive Plaintiff of his valuable assets. This is not a derivative claim, as the target objective of Defendants' actions was to obtain a steady source of funding from Plaintiff for Defendants' use and to conceal the diversion and misuse of funds. As a result of Defendants unlawful activity, Plaintiff has been materially harmed.

**Racketeering Act Two – Forgery**

87.    VICTOR HALABI, jointly and severally with other members of B & H CELLULAR, committed the following acts of forgery, any one of which alone constitutes the commission of Racketeering Count Two:

a.    On or about December 11, 2019, Defendants emailed paperwork to Plaintiff involving the making, altering, using, or possession of a false document or material with the specific intent of committing fraud in violation of 18 U.S.C. § 471. Specifically, Defendant VICTOR HALABI provided a profit and loss statement, a Balance Sheet, an abbreviated list of wire transfers, and a summary of accounts containing false and fraudulent information in place of an accurate accounting of funds provided by Plaintiff to Defendants.

b. On or about December 17, 2019, Defendant VICTOR HALABI provided Plaintiff with an email involving the making, altering, using, or possession of a false document or material with the specific intent of committing fraud in violation of 18 U.S.C. §471. Specifically, the email purported to be a communication with Captains Freight Services in Dubai regarding outstanding payments owed to Defendants for shipped goods. However, Plaintiff later discovered that the email had been fabricated and that there was no relationship or connection between such company and Defendants or any of their affiliates, nor had the communication reflected in the forged email actually taken place.

88. The target objective of the forgery was to deprive Plaintiff of his valuable assets. This is not a derivative claim, as the target objective of Defendants' actions was to obtain a steady source of funding from Plaintiff for Defendants' use and to conceal the diversion and misuse of funds. As a result of Defendants unlawful activity, Plaintiff has been materially and significantly harmed.

## SECOND COUNT

### Securities Fraud

89. All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

90.   This Count is asserted against Defendants VICTOR HALABI, SAULI HALABI and B & H CELLULAR WHOLESALE INC. based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

91.   During the relevant time period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and did: (i) deceive the Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to agree to the terms of each investment agreement. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

92.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or issuance of profit and loss statements, Excel spreadsheets, charts and other statements and documents described above, as well as oral statements directly to Plaintiffs. Such reports, documents and statements were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about Defendants' financial well-being, plans and intentions.

93.   The Plaintiff had no obligation to invest in any of the concrete individual deals presented by VICTOR HALABI or the Defendant entity or any associated entities and could have singlehandedly rejected the deals.   Instead, Plaintiff relied upon the fraudulent misrepresentations of the Defendants in agreeing to the provisions of each investment agreement.   Specifically, Plaintiff relied upon the following misrepresentations by Defendants:

94.   Defendants claimed that VICTOR HALABI ran a legitimate business averaging or exceeding thousands or hundreds of thousands of dollars per month in profitable wholesale or online sales.   This representation was materially false, as Defendants wholesale sales were routinely made at a loss, online sales were made with a profit margin significantly below that represented, and the business was cycling wire transfers through subordinate entities to create the appearance rather than the reality of revenue.

95.   Defendants represented the economic picture of B & H CELLULAR WHOLESALE through the use of spreadsheets, profit and loss statements and charts, all of which portrayed a stable company with a very healthy profit margin. This representation was also materially false, as Defendants had modified the true

numbers as eventually admitted by VICTOR HALABI and as observed by Plaintiff's accountant during tax preparation efforts.

96.   Defendant VICTOR HALABI claimed to be running a profitable business engaged in transactions with minimal or no risk due to the structure of the deals.  This representation was materially false, as VICTOR HALABI later admitted to having made every wholesale transaction at a loss, to falsifying numbers and records, and to using Plaintiff's own money to provide an appearance of revenue and to pay off personal expenses and debts.

97.   Defendant SAULI HALABI claimed that his brother was running a legitimate profitable business and that he was an honest and reliable businessman who would not lie to or steal from Plaintiff.  This representation was materially false, as VICTOR HALABI's business was never legitimate nor profitable and the majority of his statements were lies; moreover, as a previous owner of the business, SAULI HALABI knew or should have known of the structure and lack of legitimacy of the business.

98.   Had Defendants not made these fraudulent misrepresentations, Plaintiff would never have entered into the investment agreements, supplied funds or allowed charges to be made on any credit card or account.  Plaintiff justifiably relied upon Defendants' misrepresentations that B & H CELLULAR was a growing and

profitable company that would provide a steady return upon investments into risk-free deal structures.

99.   Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

100.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As Defendants have repeatedly attempted to evade or tamper with any form of document production, the majority of accurate financial records remain unavailable to Plaintiff.

101.   The Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Defendants were able to and did, directly or indirectly, control the content of the statements. As officers and/or directors of B & H CELLULAR, the Defendants had

a duty to disseminate timely, accurate, and truthful information with respect to business, operations, future financial condition and future prospects, and accurate deal structure descriptions as they related to the solicitation of investments from Plaintiff. As a result of the dissemination of the aforementioned false and misleading reports, spreadsheets and oral and written statements, Plaintiff invested in deals on multiple occasions between November 2018 and December 2019 and were damaged thereby.

102. Each Defendant acted in concert with the other Defendants and provided each of the others with substantial assistance in making the fraudulent representations, statements and omissions that led to Plaintiff's reliance.  Defendants could not have perpetrated their fraud, or consummated their plan to obtain investments in specific deals, without the substantial assistance of the others in making the fraudulent statements, representations and omissions, and each Defendant benefitted from the conduct of the others.

103. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

104. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their serial investments in the Company.

## **THIRD COUNT**
### **(Common Law Fraud/Fraudulent Inducement)**

105. All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

106. This Count is asserted against Defendants VICTOR HALABI, SAULI HALABI, and B & H CELLULAR WHOLESALE, and is based upon the fraudulent representations made, authorized, or caused to be made by the defendants in order to induce Plaintiff to proceed with multiple individual deal transactions over a period in excess of one year.

107. During the relevant time period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with convincing Plaintiff to invest and to continue investing in deals to purchase and resell products through Defendants. Defendants made these material false statements, representations and omissions when they knew or should have known that the statements, representations and omissions were untrue. Such scheme was intended to, and did: (i) deceive the Plaintiff, who had a right to rely

43

upon the veracity of Defendant's statements, representations and omissions, and who did so, as alleged herein; and (ii) cause Plaintiff to agree to the terms of each deal as presented and as entered into, thereby causing significant financial and other injury. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, acting jointly and severally, took the actions set forth herein.

108. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or issuance of statements, descriptions, documents and other representations described above, including written and oral statements directly to Plaintiff. Such statements, descriptions, documents and other representations, both oral and written, were materially false and misleading in that they failed to disclose material adverse information, misrepresented Defendants' plans and intentions, and were structured so as to fraudulently induce Plaintiff's cooperation.

109. Defendants claimed that the business operated as follows: they would receive an order for specific goods which would then be obtained and delivered with a pre-arranged profit margin through either online or wholesale processes. VICTOR HALABI represented that in a wholesale deal, once the goods were shipped by B & H CELLULAR to the forwarder in Dubai, the forwarder would hold the goods until the purchaser paid for them, then send the payment back to the business and release the goods to the end buyer. VICTOR HALABI further represented that in online

44

deals, he obtained products solely to fill pre-paid orders.  These representations were materially false, as Defendants instead purchased goods for sale online after purchase on an open market basis with a low rate of profit, and purchased goods for "wholesale" which were never sent to Dubai and which were always sold at a loss. Defendant VICTOR HALABI would then use Plaintiff's own funds to generate the appearan ce of a profit.

110.  Had Defendants not made these fraudulent misrepresentations, Plaintiff would never have agreed to invest any funds in the presented deals or in the business as a whole. On multiple occasions, Plaintiff asked questions of Defendants to ensure that the deals were taking place as described and without risk, and made repeated efforts to obtain documents that would allow him oversight.  Defendants repeatedly made misrepresentations and gave delayed, inaccurate or misleading responses or documents to ensure that Plaintiff continued to fund the scheme.

111. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants  were  committed willfully or with reckless disregard for the truth. In

addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

112. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. The Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Defendants were able to and did, directly or indirectly, control the content of the statements.

113. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have committed fraud and fraudulent inducement as defined in the common law.

114. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with his funding of deals proffered by the Defendants, funding which he would not have supplied absent his justifiable reliance upon Defendants' misrepresentations.

## FOURTH COUNT
### (Unjust Enrichment)

115. All previous paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

116. This Count is asserted against Defendants VICTOR HALABI and B & H CELLULAR WHOLESALE for actions leading to the unjust enrichment of Defendants at the expense and to the detriment of Plaintiff.

117. During the relevant time period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud Plaintiff. Such scheme was intended to, and did: (i) deceive the Plaintiff, as alleged herein; and (ii) cause Plaintiff to agree to the terms of the investment agreements. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

118. The Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, Defendant VICTOR HALABI was able to and did, directly or indirectly, control the content of the statements made to Plaintiff.

119. Defendant VICTOR HALABI profited financially in that he received funds from the Defendant entity and from Plaintiff's investments in that entity,

47

including any associated entity, in the form of separately enumerated deals, without any form of compensation to Plaintiff and when he was not the intended beneficiary of Plaintiff's investments.

120. Defendants' commission of the conduct alleged herein was unlawful, unjust and improper.  Plaintiff's reliance upon that conduct, both acts and omissions, led to the unjust enrichment of Defendants both from the proceeds of the investments and the credit card charges, as well as from the subsequent avoidance of repayment by VICTOR HALABI and B & H CELLULAR.

121. Defendants' actions by which they were enriched violated fundamental principles of justice, equity and good conscience. It is against equity and good conscience to permit Defendants to continue to be enriched at Plaintiff's expense by allowing them to retain Plaintiff's property.

122. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with his investments into and financial support of Defendant entities and any and all deals presented on behalf of Defendants.

### FIFTH COUNT
**(Constructive Trust)**

123. All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

124. This Count is asserted against all Defendants for making false statements in violation of their fiduciary duty and inducing Plaintiff to enter into investments thereby, which unjustly enriched the Defendants.

125. Plaintiff invested in multiple deals with Defendant VICTOR HALABI and B & H CELLULAR.  Plaintiff made these investments in part based on his reliance upon the assurances of SAULI HALABI, a former owner of the Defendant entity and brother of the current owner.  As such, Defendants owed Plaintiff a fiduciary duty.  Defendants breached this duty by continually providing false and misleading information in an effort to solicit further investments from Plaintiff, or to prevent him from recovering on his previous investments.

126. Defendants promised to repay Plaintiff and made multiple schedules and arrangements for doing so.

127. Plaintiff invested almost $4,000,000 in funds into deals connected with Defendants in reliance upon the repeated false promises of Defendants, $2,901,223.07 of which remains unpaid.

128. Defendants were unjustly enriched as a result of Plaintiff's reasonable reliance upon their false promises.

## SIXTH COUNT
### (Fraudulent Conveyance)

129. All prior paragraphs of this complaint are repeated, re-alleged and incorporated by reference as though set forth herein.

130. This Count is asserted against VICTOR HALABI for his conveyance of funds intended to hinder, defraud or delay creditors while enriching himself.

131. Plaintiff was a creditor of B & H CELLULAR and/or its affiliated entities at the time that Defendant made conveyances to himself and to third parties with the intention of incurring debts beyond his ability to pay and of hindering or delaying the recovery of funds by Plaintiff.

132. At all times relevant, Defendant VICTOR HALABI Eisenstadt, AFS, Chesed, and the related entities made conveyances to himself or to pay off debts or expenses owed by himself or by family members and associates without fair consideration. These conveyances had the effect of rendering Defendants insolvent and defrauding Plaintiff.

133. As a result of Defendant's actions, Defendant hindered or delayed recovery by Plaintiff, thereby causing lasting economic harm to Plaintiff.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury as to all issues.

**WHEREFORE,** Plaintiff demands judgment against Defendants for

    a. Compensatory damages in an amount no less than $2,901,223.07;

    b. Punitive damages;

    c. Treble damages;

    d.  Costs of the Suit, including Attorneys' fees and reasonable expenses;

    e.  Ordering the dissolution of the Defendant entity.

Dated:  April 4, 2022
        New York, New York

                        Respectfully submitted,

                        */s/ Maryam N. Hadden*

                        Maryam N. Hadden, Esq.
                        Parlatore Law Group, LLP
                        *Attorney for the Plaintiffs*
                        One World Trade Center, Suite 8500
                        New York, New York 10007
                        646-846-6382
                        Maryam.hadden@parlatorelawgroup.com