UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
HY HADDAD,

                Plaintiff,             **MEMORANDUM & ORDER**

    -against-                          22-CV-1906 (OEM) (JRC)

VICTOR HALABI, SOLY HALABI, and
B & H CELLULAR WHOLESALE, INC.,

                Defendants.
-----------------------------------------------------------------x

**ORELIA E. MERCHANT, United States District Judge:**

       Plaintiff Hy Haddad ("Haddad") brings this action invoking federal question jurisdiction under 28 U.S.C. § 1331 alleging, *inter alia*, that defendants Victor Halabi ("Victor") and his brother, Soly Halabi ("Soly") (together, the "Halabis"), and their company, B & H Cellular Wholesale, Inc. ("B&H"), engaged in securities fraud in violation of 15 U.S.C. § 78j(b). Soly has now moved to dismiss the claims alleged against him pursuant to Fed. R. Civ. Pro 12(b)(6). For the reasons discussed below, however, the entire complaint is *sua sponte* dismissed for lack of subject matter jurisdiction.

## BACKGROUND[1]

       Defendants Victor and Soly run B&H.[2] B&H sells "electronics such as cellular phones. iPads, Ring camera, smart watches and the like." Am. Compl. ¶ 51.

       "In November of 2018, a mutual acquaintance introduced [Haddad] to [] Victor Halabi, suggesting that they go into business together by partnering on business deals." *Id.* ¶ 47. Haddad "was familiar with V[ictor] Halabi's family, as he already knew [Soly] Halabi." *Id.* "During their

---

[1] The following facts are taken from the Amended Complaint, ECF 17 ("Am. Compl.") and are assumed to be true for the purposes of this memorandum and order, unless otherwise indicated.
[2] Soly was listed as the owner of between 2012 and 2018 and Victor was variously listed as Chairman, President, and CEO since 2010. *Id.* ¶ 4.

1

introduction, Haddad's acquaintance assured him that he had 'done a few deals' with [Victor] Halabi and his business, B & H Cellular, and that they had gone smoothly." *Id*. "Equally if not more importantly, [Soly] Halabi, whom Haddad had known both socially and as a respected member of their community for several years, assured Haddad that his brother" Victor "was reliable and honest." *Id*.

Haddad inquired about potential business deals and Victor obliged, offering "to split the profit on each deal 50/50 with Haddad in exchange for Haddad partnering with him on specific deals and providing the upfront financing." *Id.* ¶ 50. The "deals" Victor offered were structured as follows:

> Halabi claimed that he engaged in sales of electronics and similarly valuable small goods, which he described as being pre-negotiated, often pre-paid sales or "deals" which took place either through online retailers or as wholesale transactions via a shipping forwarder located in Dubai. According to [Victor] Halabi, he would receive an order for specific goods which he would obtain and deliver with a pre-arranged profit margin. [Victor] Halabi represented that once the goods were shipped by B & H Cellular to the forwarder in Dubai, the forwarder would hold the goods until the purchaser paid for them, then send the payment back to the Halabis' business and release the goods to the buyer. For example, a deal would be arranged as follows: $45,000 to purchase the goods to be forwarded, with the purchase price to be returned in one and a half weeks with $5,500 profit. Because the deals were pre-arranged by the end buyers and the profit margin was part of that negotiation, according to the Halabis, there was no risk.

*Id.* ¶ 49.

While Haddad inquired to as to the potential risk of default by the end buyer, "V[ictor] reassured him that this was rare but that finding another buyer with no change in pricing was simple because the market in Dubai was so eager for his goods." *Id*. Haddad was ultimately "persuaded by the claims of people that he knew and trusted," presumably the Halabis and his acquaintance, and began funding individual deals. *Id.* ¶ 51. He

2

allegedly did so in part because of "[Soly] Halabi's assurances … [which had] lull[ed] [Haddad] into a false sense of security." *Id.* ¶ 51.

The first "transactions seemed to go smoothly." *Id.* However, Haddad was frequently "under constant pressure to fund new purchases by rolling over the 'profits' and payments from previous purchases" and supplementing the Victor with more money to fund new deals. *Id.* ¶ 53. And Haddad was always rebuffed by the Halabis when he inquired further into the inner workings of B&H and its financing and accounting. *Id.*; *see id.* ¶ 63. Haddad alleges that the Halabis used a combination of feigned insult and reassurances—predicated on their "shared religious tenets" and Soly's stature in their religious community—to keep Haddad from exiting the scheme. *See, e.g.*, *id.* ¶¶ 48, 51, 53. "For example, on July 30, 2019, [Victor] pushed Haddad to enter a transaction for 700 items, for a cost of $455,000, claiming that the order was prepaid and his vendors would only have the stock to fill it that day." *Id.* ¶ 61. Other times, Victor claimed he would be "out on the street" if "he lost Haddad as an investor." *Id.* ¶ 53.

Haddad did attempt on several occasions to find a way to view the greater financial picture of the Halabi's purported deals. In or around April 2019, Haddad was able to persuade Victor "to conduct some business through a bank account to which both he and Haddad had access so that he could watch the flow of funds." But Chase Bank closed the account shortly after it was opened. *Id.* ¶¶ 55-56. Victor again "persuaded" Haddad to keep money "flow[ing] through May 2019 despite Haddad's growing concerns about whether Victor "could be stealing from him." *Id.* ¶¶ 77, 58.

Ultimately, in or around August 2019, Haddad was "given access to a Citibank account," but "Halabi continued to use accounts at other banks, however, ensuring that

Haddad was still kept in the dark as to the actual flow of funds." *Id.* ¶ 60. At around that same time "[Victor] Halabi began using Haddad's American Express account to purchase Apple products, claiming that he was getting special low prices and would be reselling them at a profit." *Id.* ¶ 62.

Victor Halabi's pressure campaign kept mounting into December of 2019 as Haddad became more recalcitrant to the Halabi's requests that he fund more "transactions." *See id.* ¶¶ 68-71. Haddad's unwillingness stemmed from his own need to pay off tax debts and support his family's living expenses. *Id*. Occasionally the two would exchange text messages when Victor became sufficiently afraid that the money would stop flowing. *See, e.g.*, ¶ 70.

"On December 5, 2019, [Victor] Halabi attempted to broaden [] the scheme by asking Haddad to join a real estate business venture with [Soly,]" who also made a similar overture. "Haddad refused to entangle himself further and declined." *Id.* ¶ 72.

"At the end of December, the scheme crashed to a halt." *Id.* ¶ 77. "On the morning of December 29, 2019, Haddad texted V. Halabi, asking specifically for a sit-down with him" *Id*. "Haddad met with [Victor] Halabi w[ho] told him that everything was a lie and confessed to the entire scheme – that all of the money was gone, that all of the deals were fake, that there was no Dubai forwarder and that he had been using Haddad's money to fund everything the entire time." *Id*. Allegedly, "V. Halabi would take money from Haddad, use it to purchase items that did not relate to pre-paid sales and which were sold by V. Halabi at a loss, and then used his multiple businesses and bank accounts to make it appear as if the business was profiting from the 'sales'" to keep the flow of money from Haddad coming. *Id.* ¶ 52.

4

**DISCUSSION**

While only Soly moves here for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), *see* Defendant's Memorandum of Law, ECF 44 at 3, "[f]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (a lack of subject matter jurisdiction "may be raised . . . by a court on its own initiative, at any stage in the litigation"). "[M]otions to dismiss for [lack of] subject matter jurisdiction under Rule 12(b)(1) are reviewed under the same standards as motions to dismiss for failure to state a claim under Rule 12(b)(6)." *Walker v. New York*, 345 F.Supp.2d 283, 286 (E.D.N.Y. 2004) (citations omitted).

The Amended Complaint only alleges that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331.[3] Am. Compl. ¶ 41. Specifically, the Amended Complaint alleges that all three defendants violated the substantive securities fraud provisions of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and its implementing regulation, SEC Rule 10b-5, *see* 17 C.F.R. § 240.10b–5(b). *Id.* ¶ 86.

"Section 10(b) of the Securities Exchange Act (the "Act") makes it unlawful for any person to 'use or employ, in connection with the purchase or sale of any *security* . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 15 U.S.C. § 78j(b))

---

[3] Further, diversity jurisdiction is not available to the plaintiff here as the parties are not diverse because all parties are alleged to be "residents" of New York. Am. Compl. ¶¶ 43-46.

5

(emphasis added).[4]  Therefore, "in this [] action where the parties' citizenship is not diverse, the Court's subject matter jurisdiction depends upon whether plaintiff owns an interest in what may be characterized as a 'security' under the Securities Exchange Act of 1934[.]" *GBJ Corp. v. Sequa Corp.*, 804 F. Supp. 564, 565 (S.D.N.Y. 1992) (Haight, J.); *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 553 (S.D.N.Y. 1990) ("If the transaction does not involve a "security," the court lacks subject matter jurisdiction."); *see Sec. & Exch. Comm'n v. Xia*, No. 21-CV-5350(PKC)(RER) 2022 WL 17539124, at *19 (E.D.N.Y. Dec. 8, 2022) ("For securities laws to apply, a 'security" within the meaning of Section 2(a)(1) of the Securities Act of 1933 must be present.").

Congress's fundamental aim in enacting the Act was "to eliminate serious abuses in a largely unregulated securities market." *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990). "More generally, Congress sought to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) (cleaned up).

Congress "determined that the best way to achieve its goal of protecting investors was to define the term 'security' in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." *Reeves*, 494 U.S. at 60 (cleaned up). "Congress did not, however, 'intend to provide a broad federal remedy for all fraud.'" *Id.* (quoting *Marine Bank v. Weaver,* 455 U.S. 551, 556 (1982)); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,

---

[4] "Rule 10b–5 encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). "Though the text of the Securities Exchange Act does not provide for a private cause of action for § 10(b) violations, the Court has found a right of action implied in the words of the statute and its implementing regulation." *Id.* (citing *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n. 9 (1971)). "In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (citing *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341–342 (2005)).

552 U.S. 148, 162 (2008) ("Section 10(b) does not incorporate common-law fraud into federal law.").

"The task has fallen . . . ultimately to the federal courts to decide which of the myriad financial transactions in our society come within the coverage of these statutes." *Reeves*, 494 U.S. at 60 (quoting *United Housing Foundation Inc., v. Forman,* 421 U.S. 837, 848 (1975)). "In discharging our duty, we are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation." *Id.*; *see, e.g.*, *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (in interpreting the term "security," "form should be disregarded for substance and the emphasis should be on economic reality"). "Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Marine Bank*, 455 U.S. at 560 n.11*; accord Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20-cv- 10832 (AT), 2023 WL 4507900, at *8 (S.D.N.Y. July 13, 2023), *motion to certify appeal denied*, No. 20 CIV. 10832 (AT), 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023). "The [C]ourt must ask in each case if Congress intended to bring within the ambit of the federal securities antifraud laws the particular transaction described and grievance asserted in the plaintiff's complaint." *GBJ Corp.*, 804 F. Supp. 568-69.

On the record before it, the Court does not find that any purported fraud was committed "in connection with the purchase or sale of any security . . . ." 15 U.S.C. § 78j(b). The Act indeed broadly defines the term security, in relevant portion, as: "any note, stock, treasury stock, . . . bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, . . . investment contract, . . . or, in general, any interest or instrument commonly known as a 'security[.]'" 15 U.S.C. § 77b(a)(1).

As is plain here, no such instrument just listed was ever proffered, negotiated, or executed

7

between Haddad and either Halabi or was issued in connection with to B&H (or any other company owned by the Halabis). *See generally* Am. Compl. Rather, the sum total of the vague allegations in the amended complaint indicates only that (1) Soly Halabi, through a mutual acquaintance, introduced Haddad to his brother Victor Halabi, *id.* ¶¶ 4, 47; (2) Victor proposed the "pre-paid" deal scheme in which Haddad would front money for a specific "pre-negotiated" deal and was guaranteed a "50/50" profit split once the "deal" went through, *id.* ¶¶ 49-50; (3) these solicitations for funds occurred, from what the Court can tell, orally or through text message, *see, e.g.*, *id.* ¶¶ 53 (payments were "extract[ed]" from Haddad), 57, 66-67, 80 ("Over the history of their *interactions*, Haddad invested approximately $4,000,000[.]") (emphasis added); and (3) Haddad did indeed repeatedly continued to "fund what he believed to be a legitimate business" despite his own increased wariness and was his questions as to the financial workings of the Halabis were continually rebuffed until December 2019, when the scheme unraveled. *Id.* ¶¶ 52, 61, 71, 73, 77-80. It is alleged that, at certain times, Haddad received some return payment as promised, *id.* ¶ 52, but Haddad further alleges that it was actually "money previously invested by Haddad himself" and that "[o]n many occasions, V. Halabi would not return any of the money to Haddad, instead claiming that he was 'rolling it over' into the next partially or wholly fictitious deal." *Id.* While this scheme—which is taken as true for the purposes of this motion—makes Haddad's present position lamentable, it is not securities fraud. The brush Congress choose to utilize does not paint that wide.

Rather, on the face of the amended complaint, "[i]t remains undisputed that the agreement was arrived at through one-on-one negotiation. Federal securities laws are not properly invoked where a loan results from direct negotiations between the parties."[5] *Tab P'ship v. Grantland Fin.*

---

[5] To be sure, Congress intended to cover "investment contracts," which, under the test set forth in *Howey*, "involves [1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." *SEC*

*Corp.*, 866 F. Supp. 807, 809 (S.D.N.Y. 1994) (citing *Marine Bank*, 455 U.S. at 559-60). *See Equitable Life Assur. Soc. of U.S. v. Arthur Andersen & Co.*, 655 F. Supp. 1225, 1245 (S.D.N.Y. 1987) ("A situation such as this, where a note is given to an insurance company in the course of an independently investigated, privately negotiated, and totally unique commercial financing transaction, where no secondary market is contemplated, was not within the conception of the drafters of the securities laws."); *Equitable Life Assur. Soc. of U.S. v. Arthur Andersen & Co.*, 655 F. Supp. 1225, 1243 (S.D.N.Y. 1987) ("Moreover, the fact that the agreement between Frigitemp and Equitable was an isolated transaction with the resultant notes not designed for public trading indicates that no offering of securities occurred.").

Further, like in *Marine Bank*, the Halabis "distributed no prospectus to [Haddad] or to other potential investors, and the unique agreement they negotiated was not designed to be traded publicly." *Marine Bank*, 455 U.S. at 559-60 (rejecting finding a security where the transaction at issues was a "unique agreement, negotiated one-on-one by the parties"). Additionally, Haddad's "use of the word 'investor'" throughout the complaint "is not a sufficient showing that the defendants intended to trade this agreement publicly." *Tab P'ship*, 866 F. Supp. 809. Lastly, the amended complaint also indicates that Haddad sought – and at one period did have – some minimal control over the finances of some the deals through a bank account, though that account was quickly closed. Am. Compl. ¶¶ 55-56 ("At one point, V. Halabi did conduct some business

---

*v. W.J. Howey Co.,* 328 U.S. 293, 301 (1946). However, as alleged here, there is no "common enterprise," which requires a "pool of investors" or "body of investors" having some sort of "horizontal" or "vertical" relationship to the promoter of the investment scheme. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87-88 (2d Cir. 1994). The Amended Complaint's own allegations show assert that Haddad was the "single investor" in each of the "deals" struck with the Halabis and no other individuals pooled any money or resources into the deals along with him. Am. Compl. ¶¶ 9, 52. Accordingly, no "investment contract" security can be present. *Cf. Revak*, 18 F.3d at 87-88 (rejecting the finding of an investment contract security in the sale of rental condominiums because there was, inter alia, no horizontal pooling of the investor-purchasers' assets because"[t]he rents and expenses attributable to each unit were not shared or pooled in any manner, but were instead the sole responsibility of the unit owner.").

9

through a bank account to which both he and Haddad had access so that Haddad could watch the flow of funds"). This further undercuts any indication that a "security" was involved here. *Cf. Equitable Life*, 655 F. Supp. at 1239 (opining that an "extensive 'measure of control' over [a counterparty] is consistent with a commercial financing transaction as opposed to a securities transaction.").

Though Congress "enacted a broad definition of 'security,' sufficient 'to encompass virtually any instrument that might be sold as an investment,'" *S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004), it "did not intend to provide a broad federal remedy for all fraud." *Marine Bank*, 455 U.S. at 55. To find that a security existed here would "risk that the federal power would be used to invite litigation beyond the immediate sphere of securities litigation and in areas already governed by functioning and effective state-law guarantees." *Stoneridge Inv. Partners, LLC*, 552 U.S. at 161 (citing *Marine Bank*, 455 U.S. at 556). Controlling Supreme Court "precedent[] counsel against this extension." *Id.* "The allegations of fraud in the present case in no way threatened the integrity of securities transactions or markets as such. They simply bespeak frustrations of a private contractual expectancy." *GBJ Corp.*, 804 F. Supp. at 569.

The Court declines to expand the term "security" so broad as to cover the transactions alleged here and, consequently, the amended complaint must be dismissed in its entirety.

## CONCLUSION

For the foregoing reasons, the complaint fails to allege the existence of any "security" under 15 U.S.C. § 77b. Accordingly, the Court does not have subject matter jurisdiction and the Amended Complaint must be dismissed in its entirety. *See* Fed. R. Civ. P. (12)(h)(3); *see also*

*GBJ Corp.*, 804 F. Supp. at 570. In so much as this is the only federal claim, the pendent claims alleged in the remaining causes of action are dismissed without prejudice, and the Clerk is directed to close the case.

**SO ORDERED.**

/s/ Orelia E. Merchant
ORELIA E. MERCHANT
United States District Judge

Dated:        November 27, 2023
              Brooklyn, New York

11